FILED

05/25/2021

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 9, 2021 Session

## STATE OF TENNESSEE v. WILLIAM ALAN LADD

**Appeal from the Circuit Court for Rutherford County
No. F-77247  David M. Bragg, Judge**

_____

### No. M2020-00264-CCA-R3-CD

_____

The Defendant, William Alan Ladd, appeals his convictions for aggravated sexual battery and sexual exploitation of a minor by electronic means, for which he received an effective eight-year sentence.  On appeal, the Defendant contends that the evidence is insufficient to support his convictions and that the trial court erred in excluding extrinsic evidence of a prior statement by the victim.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT H. MONTGOMERY, JR., JJ., joined.

Kirk D. Catron (at trial and on appeal) and Derek R. Howard (at trial), Murfreesboro, Tennessee, for the appellant, William Alan Ladd.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Jennings H. Jones, District Attorney General; and Sharon Reddick and Allyson Abbott, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

The Defendant was charged with aggravated sexual battery and sexual exploitation of a minor after he showed pornographic videos to his then-girlfriend's minor daughter and forced her to touch his penis on one occasion between January 1, 2012, and December 31, 2015.  The victim disclosed the abuse to the Defendant's younger daughter

shortly after it occurred, and the Defendant's daughter was overheard discussing the victim's disclosure in October of 2016 while she and the victim were on a school bus. Following a referral to the Department of Children's Services ("DCS"), an investigation was conducted, and the victim disclosed the abuse during a forensic interview. The Defendant later was arrested and charged as a result.

The victim, who was twelve years old and in the sixth grade at the time of trial, testified that when she was in the second grade, she, her mother, the Defendant, and the Defendant's daughter moved into a two-story house in Rockvale, Tennessee. The victim and the Defendant's daughter each had their own bedroom on the first floor, while the Defendant and the victim's mother slept in a loft area on the second floor. The second floor also included a bathroom and a storage area where the victim and the Defendant's daughter played. The loft area included a bed, a couch, and a television. The victim stated that she and the Defendant's daughter watched movies and played video games on the second floor and would occasionally fall asleep in the area.

The victim recalled an occasion when she woke up from sleeping on the second floor and had to use the bathroom. She did not know what time she awoke. She stated that her mother was sleeping on the bed and that the Defendant's daughter was sleeping on either the couch or the floor. The victim approached the upstairs bathroom and noticed that the door was closed. She testified that she knocked on the door, that the Defendant told her to enter, and that she walked into the bathroom and closed the door. The Defendant was sitting naked on the toilet with a towel over his lap and holding his cell phone.

The victim testified that the Defendant told her that he would purchase a video game for her and instructed her not to tell anyone. The Defendant showed the victim at least two videos on his cell phone and told her that the videos depicted a man and his daughter. The victim stated that in the first video, the man was naked and that the female was clothed. She said the second video depicted a different man and a girl, who appeared to be a teenager, and the victim did not believe the girl was wearing clothing. The victim stated that the females in the videos each had their mouths on the man's body part and identified male genitalia in a diagram of the human body as the area on which the females had their mouths.

The victim testified that after showing her the videos, the Defendant got up from the toilet while holding the towel over his lap, sat at the edge of the bathtub, and removed the towel. The victim said the Defendant asked her to touch "it" and identified male genitalia in a diagram of the human body as the area in which the Defendant asked her to touch. The victim stated that when she refused, the Defendant grabbed her wrist and forced her to do so. The victim pulled her hand back, and the Defendant instructed her to

- 2 -

not tell anyone. The victim testified that the Defendant mentioned his intention of doing the same thing to his daughter. He instructed the victim to leave and to close the door behind her, and the victim complied.

The victim testified that after leaving the bathroom, she saw the Defendant's daughter in the hallway and took her to their playroom where the victim told the Defendant's daughter what had occurred. The victim explained that she wanted to warn the Defendant's daughter since the Defendant had stated that he would do the same thing to his daughter. The Defendant's daughter did not believe the victim, and the victim instructed her not to tell anyone. They did not discuss the incident any further, and the victim acted as if nothing had occurred. The victim testified that she did not intend to tell anyone else about the incident.

The victim stated that sometime after the incident, she overheard the Defendant's daughter telling two girls about the incident while they were on the school bus going to the home of the Defendant's parents after school. The victim said she was surprised, explaining that she believed that "because the Defendant's daughter doesn't really remember things, she would have forgotten it." The victim stated that she was "surprised and slightly confused" because she had "completely forgot about it at that point." A middle school student, who was sitting next to the victim, overheard the conversation and asked the victim about it, and the victim responded.

On the following day, the victim was called to the school counselor's office where she saw the middle school student. The school counselor asked the victim questions about the incident. The victim testified that she also spoke to others who asked her about what had occurred in the bathroom and that the victim did not respond. The victim stated that at one point after she, her mother, the Defendant, and the Defendant's daughter moved out of the Rockvale home and into a home in Murfreesboro, her mother asked her about the incident and that the victim did not respond. The victim believed she told her mother and two other people that the incident did not occur and explained that at that time, she did not want to discuss it. The victim testified that at some point, she underwent a forensic interview during which she disclosed what had occurred. She maintained that she was truthful during the interview. She also disclosed what had occurred to her mother, who cried and hugged her.

On cross-examination, the victim testified that she did not recall ever lying to get someone into trouble. She denied ever stating that she liked to lie to get people into trouble and did not recall telling an adult that she loved to lie because people would get into trouble. She said, "I wouldn't have said that to an adult."

- 3 -

The victim testified that while the incident occurred on a weekend, she could not recall her age or the month, year, or season in which it occurred. She did not recall how much time had passed between the incident and the conversation on the school bus, but she agreed that more than one month but not quite a year had passed. She stated that the Defendant never did anything else to her and that she had forgotten about the incident until the conversation on the bus. She agreed that she was "content" living in the house with her mother, the Defendant, and the Defendant's daughter. On redirect examination, the victim testified that she was still living in the Rockvale home when the conversation on the school bus occurred and that she was living in the home in Murfreesboro when she was questioned by others about the incident.

The middle school student who overheard the conversation on the bus testified that in the fall of 2016, when she was in the eighth grade, she and other middle school students rode the school bus with several elementary school students. The middle school student stated that one day, she overheard a conversation between the Defendant's daughter and another student while the middle school student was sitting next to the Defendant's daughter on the bus. The middle school student asked the victim, who was sitting in the seat in front of her, about the conversation. The victim did not respond but acted nervous and scared. As a result, the middle school student sent a text message to the middle school student's mother.

When the middle school student arrived at her home, she spoke to her mother, who contacted an officer, a family friend. The next morning, her parents went to the elementary school and spoke to the school resource officer ("SRO"). A woman from the sheriff's department spoke to the middle school student, who relayed the conversation on the bus.

Ms. Emily Vogt, the school counselor at the elementary school the victim attended, testified that on October 11, 2016, the SRO contacted her about the victim. Ms. Vogt questioned the victim, who was in the fourth grade at that time, about what Ms. Vogt had learned from the SRO. Ms. Vogt testified that while the victim was "embarrassed," she confirmed what Ms. Vogt had learned from the SRO. As a result, Ms. Vogt contacted DCS. The victim withdrew from the school on October 17th.

The victim's mother testified that she began a relationship with the Defendant during the summer of 2012 and that they moved into a two-story house in Rockvale with the victim and the Defendant's daughter in April of 2013 when the victim was seven years old. The victim's mother stated that she and the Defendant slept on the second floor, that the second floor included an open area with a couch and two televisions with video game consoles, and that the victim and the Defendant's daughter occasionally slept on the second floor. They moved out of the house in August of 2015 when the victim

was nine years old, after their landlord sold the house. The Defendant and his daughter moved in with his parents, and the victim and her mother moved in with the victim's grandmother until the Defendant and the victim's mother could find another home. In early 2016, the Defendant, his daughter, the victim, and her mother moved into a house in Murfreesboro. The Defendant and the victim's mother reported the girls as living at the address of the Defendant's parents so that the girls could continue to attend school in Rockvale. After school each day, the girls rode the school bus to the home of the Defendant's parents.

On October 11, 2016, the Defendant, his daughter, the victim, and her mother were living in the Murfreesboro home; the victim's mother and the Defendant were engaged; and the Defendant had been unemployed for about three weeks after being terminated from his job. Neither the Defendant's vehicle nor the vehicle of the victim's mother was operable, so they were using a truck borrowed from the Defendant's parents.

The victim's mother testified that on October 11th, she received a call from DCS personnel, who informed her that allegations involving the Defendant and the victim had been reported and asked her to meet with DCS personnel. The victim's mother left work and met with a detective and DCS personnel. The victim's mother said she did not contact the Defendant prior to the meeting.

Following the meeting, the victim's mother went to the school to retrieve the victim, who had archery practice, and learned that the Defendant's mother already had done so. The victim's mother then went home to retrieve the Defendant before going to his parents' home as she had been doing since the Defendant lost his job. The victim's mother explained that she did not want to show up to his parents' home alone while driving their truck. She stated that she did not believe she had been instructed by the detective or DCS personnel at that point that the Defendant should not be around the victim. She did not want to be around the Defendant and stated that she knew the victim did not want to be around him even though the victim's mother acknowledged that she had not yet spoken with the victim and was unsure what the victim would say. The victim was outside the home when her mother and the Defendant arrived, and the victim's mother was too nauseated to leave the truck. The victim's mother, the Defendant, and the victim went to their home, while the Defendant's daughter remained with his parents for the night.

The victim's mother testified that she did not inform the Defendant of the investigation. At some point that evening, the victim's mother received a message from the detective, and, as a result, she told the Defendant that he needed to meet with the detective. The victim's mother denied telling the Defendant the purpose of the meeting.

She acknowledged that when she was upset, nauseated, and sitting on the bathroom floor, she told the Defendant that the meeting was about what he had done to the victim.

The Defendant left the home on the night of October 11th, telling the victim's mother that he was going to meet with the detective. The victim's mother testified that after the Defendant left, she spoke to the victim, who seemed as if she wanted to talk about the allegations but did not provide many details. The Defendant returned that night to retrieve his clothes and to put gasoline in the truck, and a friend drove him away from the home. A detective and a member of DCS personnel were present to ensure that the Defendant left the home.

The Defendant returned the next day to work on repairing the vehicles while the victim was at school and her mother was at work. The victim's mother testified that the Defendant sent her approximately forty text messages throughout the day, stating that the allegations were false and that law enforcement and DCS personnel acted illegally in removing the girls from class and questioning them outside the presence of the Defendant or the victim's mother. The Defendant said that he planned to hire an attorney to sue based upon the "illegal" actions and that he wanted to return to the home and continue his relationship with the victim's mother. The victim's mother stated that the Defendant "was just making it seem like everything was okay, like nothing happened."

The victim's grandmother retrieved the victim after school while the victim's mother returned to her home where the Defendant was continuing to work on repairing the vehicles. The victim's mother testified that the Defendant convinced her to call the detective and DCS personnel and tell them that the allegations were false. While the victim's mother did not recall what the Defendant said to convince her to make the calls, she stated, "[I]t was like nonstop." The Defendant was angry when he instructed her to call, and the victim's mother stated that she did not feel that she had a choice. She also stated that while she "had a feeling" that the allegation was true, she was not entirely certain. The Defendant remained beside the victim's mother while she spoke with the detective.

When the victim arrived home, her mother sent her to her room and instructed her to complete her homework. While the Defendant was outside working on the vehicles, the victim's mother spoke to the victim about the allegations. The victim's mother testified that the victim was more forthcoming and that the victim's statements to her were consistent with the information that the victim's mother had been provided regarding the allegations. The victim's mother stated that she did not recall being instructed that the Defendant was not supposed to be on the premises with the victim but that she recalled feeling as if he was not supposed to be there. After the Defendant worked on the vehicles, he came inside the home, fell asleep on the couch, and remained

in the residence overnight. The victim's mother said that when she confronted the Defendant about the allegations, he "just made it sound like he got away with something."

The victim's mother scheduled a forensic interview with the victim the following day. The victim's mother drove the victim to the interview in the truck belonging to the Defendant's parents, and following the interview, she and the victim drove to another town to search for a place to live. The victim's mother stated that the Defendant had sent her text messages throughout the day, asking what was occurring and demanding that she return the truck. Later, the victim's mother met Ms. Venessa Hyer with DCS in a parking lot to return the truck to the Defendant. The victim's mother left the truck in the parking lot with the keys and the ring that the Defendant had given her inside the truck and got into a car with the victim's grandmother. The victim's mother testified that the Defendant arrived with his sister, who stopped in front of the car where the victim's mother was sitting. The Defendant exited the vehicle, approached the window near where the victim's mother was sitting, and began asking what she was doing and what was happening. At that point, the victim's mother had not informed the Defendant that she was cooperating in the investigation. The victim's mother stated that she felt threatened and instructed the victim's grandmother to drive to the detective's office. The Defendant and his sister closely followed the victim's mother and the victim's grandmother while they were driving to the detective's office and turned off shortly before they arrived.

The victim's mother and the Defendant subsequently arranged for the Defendant to retrieve his belongings from their home, which occurred without incident. The victim's mother then ceased all further communication with the Defendant. The victim's mother removed the victim from the school where she was attending and enrolled her in another school, and they moved approximately one month later.

The victim's mother testified that the Defendant had six or seven different cell phones during their relationship and that the cell phones often broke and had to be replaced. The Defendant had a different cell phone while living in Rockvale than he did while living in Murfreesboro. He had access to the internet from his cell phone and used the internet on a regular basis.

The victim's mother testified that Mr. Jack Collopy was a friend of the Defendant's parents with whom neither she nor the victim spent a great amount of time. The victim's mother stated that she would not have agreed for him to babysit the victim. On cross-examination, the victim's mother testified that Mr. Collopy often visited the Defendant's parents in their home. She noted that Mr. Daniel Horne lived with her and

the Defendant for about six months in the Rockvale home and moved out when the Defendant and the victim's mother left the home.

The victim's mother stated that she called both the detective and DCS personnel and told them that the allegations were untrue. The Defendant was with her when she called the detective. He then instructed her to contact DCS personnel and called her to ensure that she had made the call as instructed. The victim's mother stated that while the Defendant did not threaten her "outright," he was yelling and using "aggressive body language."

The victim's mother acknowledged that she had sexual relations with the Defendant on the evening after he returned home following the allegations. She explained that she had told the Defendant that she had not yet spoken to the victim about the allegations and that she did not want the Defendant to know her plans to cooperate with the investigation.

The victim's mother testified that she never witnessed the Defendant acting inappropriately toward a child, and she agreed that it would not be like the Defendant to touch a child inappropriately. The victim's mother recalled two occasions when they first moved into the Rockvale home during which the Defendant asked her to watch pornographic films with him and she refused. She was unaware of the Defendant watching pornographic films alone. On redirect examination, the victim's mother testified that while they were still living in the Rockvale home, the Defendant told her that he watched pornography while in the bathroom.

Ms. Venessa Hyer, a child protective service investigator with DCS, testified that on October 11, 2016, she received a referral regarding the victim. Ms. Hyer and Detective Andrea Knox went to the elementary school and spoke to the victim and the Defendant's daughter. The Defendant's daughter did not provide any information. However, the information provided by the victim was consistent with the information that Ms. Hyer had been provided in the referral. Ms. Hyer and Detective Knox then went to the middle school where they spoke to the middle school student who had been on the bus with the victim and the Defendant's daughter.

Ms. Hyer and Detective Knox obtained the victim's address from the school and went to the address in an effort to locate the victim's mother. When they arrived, they learned that the address was the home of the Defendant's parents. Once Ms. Hyer and Detective Knox returned to the Sheriff's Department, they called the victim's mother, who then met with them.

Ms. Hyer later met with the Defendant at the police station after he met with Detective Knox. Although DCS generally did not record such interviews, Ms. Hyer learned that a portion of her interview with the Defendant was recorded. That portion of the interview was played for the jury at trial. During the interview, Ms. Hyer told the Defendant that he could not be in the same house as the victim but that he could return to the home to work on the vehicles while the victim was at school. Ms. Hyer agreed to arrange for the Defendant to retrieve some of his belongings from the home. The Defendant stated that the victim's mother knew that he did not commit the acts and that she had told him that he needed to go to the Sheriff's Department. The Defendant also stated that this was not the first time that the victim had falsely blamed him for something that he did not do. Ms. Hyer testified that after the interview, she followed the Defendant back to the residence so that he could retrieve some of his belongings and to ensure that the Defendant did not have any contact with the victim.

Ms. Hyer stated that the victim's mother called her to schedule a forensic interview. Ms. Hyer observed the interview through a closed-circuit television and stated that the information obtained from the victim during the interview was consistent with the information that Ms. Hyer already knew. Ms. Hyer also accompanied the victim's mother to return the truck belonging to the Defendant's parents to the Defendant and his family. On cross-examination, Ms. Hyer testified that she did not recall the victim's mother calling her and stating that she did not believe that the allegations were true.

Detective Andrea Knox, who was a member of the Criminal Investigations Divisions, Special Victims Unit of the Rutherford County Sheriff's Department, investigated the allegations against the Defendant. She testified that she and Ms. Hyer met with the victim at her school. The victim told Detective Knox about a "secret" that was "very inappropriate" and related to "adult stuff." Detective Knox eliminated consuming alcohol and smoking cigarettes as the topics. The victim reported that she had been touched, but she did not want to reveal the body part involved. The victim wrote "sex" in Ms. Hyer's notebook, which led Detective Knox to believe that the victim had been sexually assaulted. The victim told Detective Knox that the touching occurred in front and below the waist, that it occurred at a former residence while upstairs, and that she told the Defendant's daughter about the assault in order to protect her. Detective Knox testified that this information was consistent with the information that she had received from the DCS referral and that she determined that an investigation was necessary.

Detective Knox testified that she also interviewed the middle school student from the bus and that the information provided by the student was consistent with the information that Detective Knox received in the DCS referral. Detective Knox met with the victim's mother, who seemed shocked but appeared to be supportive of the victim.

According to the victim's mother, they lived in the home in Rockvale where the victim stated that the incident occurred from 2012 until 2015.

Detective Knox called the Defendant and asked to meet with him, and the Defendant voluntarily came to the Sheriff's Department on October 11, 2016. When Detective Knox called the Defendant, she asked to speak to him about a "private matter" and did not inform him of the allegations until the interview. Detective Knox testified that she believed the Defendant had spoken to someone connected to the case before he arrived. She stated that the Defendant was not in custody during the interview and that the interview was video recorded. The recording was played for the jury at trial

During the interview, the Defendant denied forcing the victim to touch his penis or otherwise sexually assaulting her. He stated that he likely took something away from the victim and that the victim became angry and made up the allegations. The Defendant gave examples of when the victim had lied previously, and the Defendant stated that the victim previously had blamed him for things that he did not do. He also stated that the victim lied whenever she believed she was going to be in trouble.

The Defendant told Detective Knox that he always locked the bathroom door and that the only time that he would have called the victim to the bathroom was when he needed toilet paper. He stated that during those instances, he always covered himself with a towel and that the victim may have seen him in the nude when he was reaching for a towel. Detective Knox testified that she first became aware that a towel might be involved during the Defendant's interview.

At the time of the Defendant's interview, Detective Knox was unaware of any allegations that the Defendant had showed the victim pornographic videos. She learned of the videos during the victim's forensic interview. Detective Knox spoke to the victim's mother about the videos and learned that the Defendant did not have the same cell phone in 2016 as he had between 2012 and 2015.

On cross-examination, Detective Knox testified that the victim told her that the incident occurred around fall break or between Thanksgiving and Christmas. The victim never expressed to Detective Knox any reservations about being around the Defendant after the incident occurred.

Ms. Amanda Pruitt, a forensic interviewer with the Child Advocacy Center of Rutherford County, conducted the forensic interview of the victim on October 13, 2016. The interview was audio and video recorded and played for the jury at trial. During the interview, the victim stated that she was ten years old and in the fourth grade. She said that when she was eight or nine years old, she walked into a bathroom in her former

house where she saw the Defendant sitting on the toilet with a towel on his lap. The Defendant talked to the victim about video games and then showed her a couple of "inappropriate videos" on his cell phone. The victim stated that the videos showed a nude man and a teenage girl, who was wearing clothes and whose mouth was on the man's "pp." The victim said the Defendant told her that the videos depicted a father and his teenage daughter. The victim did not want to say the Defendant's additional statements about the videos but was willing to write down the statement. Ms. Pruitt gave the victim a piece of paper on which the victim wrote, "This is how to have sex."

The victim told Ms. Pruitt that the Defendant removed his towel and told her to touch "it." Upon further questioning, the victim agreed to write down the Defendant's statement. Ms. Pruitt handed the victim a piece of paper, and the victim wrote, "He said to touch his pp." Ms. Pruitt showed the victim a diagram of the human body, and the victim circled the male genitalia as the area that the Defendant instructed her to touch. The victim said that when she refused, the Defendant grabbed her hand and made her touch his "pp." The victim demonstrated how the Defendant formed her hand in a circle before forcing her to touch his penis. She stated that when she pulled her hand back, the Defendant then touched his penis. The Defendant instructed her not to tell anyone and said it would happen to his daughter too. The victim said she told the Defendant's daughter, who did not believe her. Ms. Pruitt testified that to her knowledge, the victim never recanted her disclosure.

In his defense, the Defendant presented the testimony of his parents and his sister, as well as Mr. Jack Collopy, who was a friend of the Defendant's parents, and Mr. Daniel Horne, who lived with the Defendant and the victim's mother for a time period. They each testified that the victim and the Defendant had a good relationship and were affectionate toward each other and that the Defendant treated the victim like his own daughter.

The Defendant testified in his own defense, denying ever touching the victim inappropriately or forcing the victim to touch his penis. He stated that he would not have allowed the victim to enter the bathroom while he was inside. He denied showing the victim pornographic videos and said he did not know why the victim made up the story.

The Defendant testified that he asked the victim's mother to watch pornography with him when they first began their relationship and that the victim's mother declined. He said that he "let it go" and that he never told the victim's mother that he watched pornography in the bathroom.

The Defendant stated that he did not know why the detective wanted to speak to him when the detective called him, and he said the victim's mother never told him why

she was upset prior to his interview with the detective. He maintained that during the interview, he was not asked to waive his right to counsel and was not given the opportunity to contact an attorney. The Defendant denied threatening or coercing the victim's mother to call the detective and stated that the allegations were false. He maintained that the victim's mother made the call of her own volition. He said he and the victim's mother engaged in sexual relations that evening. He moved out of the home in October of 2016 and was arrested for the charges in March of 2017.

On cross-examination, the Defendant agreed that Detective Knox did not violate any of his rights during the interview. He agreed that he was free to leave at any time and that he was free to have an attorney present if he so chose. He stated that others told him that law enforcement was not allowed to interview children outside the presence of an adult and that he repeated what he had been told to the victim's mother. The Defendant agreed that he returned to the home and was around the victim even though he had been instructed that he was not to be in her presence.

The jury convicted the Defendant of aggravated sexual battery and sexual exploitation of a minor by electronic means. At the sentencing hearing, the parties agreed to an effective sentence of eight years' incarceration, and the trial court imposed the agreed-upon sentence. The Defendant filed a motion and an amended motion for new trial, and the trial court denied the motions following a hearing. The Defendant appeals, arguing that the evidence is insufficient to support his convictions and that the trial court erred in excluding extrinsic evidence of a prior statement by the victim.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant challenges the sufficiency of the evidence supporting his convictions, arguing that the State solely relied on the victim's testimony and prior statements, which he claims were inconsistent, not credible, and lacking in detail. The State responds that the evidence is sufficient to support the convictions. We agree with the State.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn.

- 12 -

2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

As related to this case, aggravated sexual battery is the "unlawful sexual contact with a victim by the defendant or the defendant by a victim" where the victim is less than thirteen years old. T.C.A. § 39-13-504(a)(4). Aggravated sexual battery is a Class B felony. T.C.A. § 39-13-504(b). "Sexual contact" is defined as "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6). "Intimate parts" includes "the primary genital area." T.C.A. § 39-13-501(2).

Furthermore, Tennessee Code Annotated section 39-13-529(b) sets forth the offense of sexual exploitation of a minor by electronic means, providing,

> It is unlawful for any person eighteen (18) years of age or older, directly or by means of electronic communication, electronic mail or internet service, including webcam communications, to intentionally:
>
> ….
>
> (2) Display to a minor, or expose a minor to, any material containing simulated sexual activity that is patently offensive or sexual activity if the purpose of the display can reasonably be construed as being for the sexual arousal or gratification of the minor or the person displaying the material[.]

- 13 -

T.C.A. § 39-13-529(b)(2) (Supp. 2012 & 2014). "Sexual activity" includes "oral intercourse." T.C.A. § 39-13-529(e)(4)(A) (Supp. 2012), (d)(4)(A) (2014). The offense constitutes a Class C felony if the minor is less than thirteen years old. T.C.A. § 39-13-529(f)(2) (Supp. 2012), (e)(2) (2014).

When viewed in the light most favorable to the State, the evidence presented at trial established that one morning between 2012 and 2015, when the victim was less than thirteen years old, she awoke from sleeping upstairs in the house where she lived in Rockvale, needing to use the bathroom. She knocked on the bathroom door, and the Defendant told her to enter. Upon entering the bathroom, the victim saw the Defendant sitting nude on the toilet with a towel over his lap. The victim testified that after discussing video games, the Defendant showed her multiple videos on his cell phone. According to the victim's testimony at trial, the videos depicted a man and a woman or teenage girl with the female's mouth on the man's genitals. After showing her the videos, the Defendant sat on the edge of the bathtub, removed his towel, and asked the victim to touch his penis. The victim testified that when she refused, the Defendant grabbed her wrist and forced her to touch it. The victim's testimony at trial regarding these events was consistent with her statements during the forensic interview.

The Defendant argues that the evidence is insufficient to sustain his convictions because the victim's testimony was inconsistent and not credible and there was not physical evidence to support her testimony. However, "there is no requirement that the victim's testimony be corroborated." *State v. Smith*, 42 S.W.3d 101, 106 (Tenn. Crim. App. 2000). Rather, our courts have repeatedly held that the testimony of a sexual assault victim standing alone is sufficient to sustain a conviction. *See, e.g. State v. James Chesteen*, No. W2012-01998-CCA-R3-CD, 2014 WL, 4267458, at *7 (Tenn. Crim. App. Aug. 24, 2014); *State v. Wyrick*, 62 S.W.3d 751, 767 (Tenn. Crim. App. 2001). While the Defendant challenges the credibility of the victim's testimony, any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence" were resolved by the jury as the trier of fact, and we may not reconsider the jury's credibility assessment. *Bland*, 958 S.W.2d at 659. Rather, we conclude that the evidence, when viewed in the light most favorable to the State, is sufficient to support the convictions.

## II. Exclusion of Extrinsic Evidence of the Victim's Prior Statement

The Defendant asserts that the trial court erred in excluding extrinsic evidence that the victim previously had stated that she liked to lie in order to get others into trouble. The Defendant contends that the evidence was admissible pursuant to Tennessee Rule of Evidence 613 as a prior inconsistent statement because the victim denied on cross-examination that she had ever made such a statement. The Defendant also contends that

the trial court's exclusion of the evidence violated his confrontation rights. The State responds that the trial court properly exercised its discretion in excluding the evidence and that the Defendant waived his claim that his constitutional right to confront witnesses was violated by raising the claim for the first time on appeal. We agree with the State.

### A. Trial Proceedings

Prior to trial, the State filed a motion requesting that the trial court instruct the defense against presenting any evidence or making any statements regarding a witness's personal opinion as to the credibility of the victim's account of the abuse that fails to meet the relevancy standards in Tennessee Rule of Evidence 401 and invades the province of the jury. The State also requested that the trial court instruct the defense that any attempts to impeach the credibility of any of the State's witnesses though the use of character evidence must strictly comply with the requirements of Tennessee Rules of Evidence 404 and 608.

At trial, defense counsel questioned the victim on cross-examination as follows:

Q. Okay. And has anyone—have you ever lied to get someone in trouble?

A. Not that I remember.

Q. Okay. Have you ever said that you like to lie to get people in trouble?

A. No.

Q. Do you recall telling any adults or any grownups that you love to lie because … it gets people in trouble?

A. No.

Q. And that's something you never would have said?

A. I wouldn't have said that to an adult.

After the close of the State's proof, the State renewed its pretrial motion. Defense counsel announced that he planned to present witnesses to testify about specific instances during which the victim lied and stated that she liked to lie to get people into trouble. Defense counsel argued that the evidence was admissible pursuant to Tennessee Rules of Evidence 404 and 608. The State responded that pursuant to Rule 608, the Defendant was "stuck" with the victim's answer on cross-examination in which she denied stating

that she ever told an adult that she lied in order to get people into trouble and that Rule 608 provided that specific instances of conduct may not be proven through extrinsic evidence. The trial court found that the evidence was inadmissible but allowed the Defendant to make an offer of proof.

During a hearing outside the presence of the jury, Ms. Kayla Ladd, the Defendant's sister, testified that she had been around the victim on multiple occasions and had babysat her in the past. She recalled an occasion during which she was playing basketball with the victim and the Defendant's daughter when the victim was seven or eight years old. The victim became angry and threw the basketball at the Defendant's daughter, striking her in the face and causing her to cry. Ms. Kayla Ladd stated that when she asked the victim why she struck the Defendant's daughter, the victim said she did not know, denied striking the Defendant's daughter, and maintained that the Defendant's daughter struck her. Ms. Kayla Ladd asked the victim why she was lying, and the victim said she did not know. Ms. Kayla Ladd testified that the victim later was asked why she liked to lie and that the victim responded that "she enjoys getting people in trouble, that she doesn't get in trouble, and she thinks it's funny."

Mr. Collopy testified that while he was at the home of the Defendant's parents, he overheard the victim state that she liked to lie in order to get people into trouble. Mr. Collopy stated that he knew the victim to lie previously and that as a result, he was not comfortable being alone around her. Mr. Ronald Ladd, the Defendant's father, also testified that he overheard the victim state that she enjoyed lying to get people into trouble and that she did not get into trouble. He stated that the victim "lies about everything" and that he was not comfortable being alone with the victim as a result.

The trial court disallowed the proof, finding that the proof constituted extrinsic evidence of specific instances of conduct used for attacking the victim's character, which was prohibited under Rule 608. The Defendant requested permission to seek an interlocutory appeal, and the trial court denied the request.

Following a recess, the State announced that it had changed its position on the admissibility of the proof and now believed that evidence that the victim previously stated that she like to lie to get people into trouble was admissible for impeachment as a prior inconsistent statement pursuant to Tennessee Rule of Evidence 613 because the victim testified on cross-examination that she had never made such a statement. In excluding the evidence, the trial court noted that despite the State's pretrial motion, defense counsel provided no notice of the evidence and did not reveal the prior statement before defense counsel "spr[a]ng" it on the victim on cross-examination. The trial court also noted that although defense counsel was aware of when the statement was made, those who were present, and the circumstances surrounding the making of the statement,

defense counsel did not provide this contextual information in questioning the victim in order to allow her to adequately examine her memory. Rather, defense counsel only asked the victim if she had ever made the statement. The trial court found that defense counsel failed to provide the victim with sufficient information regarding the prior statement in order to allow the victim to provide a responsive answer when questioned about it. The trial court stated that to permit extrinsic evidence of the victim's prior statement under these circumstances would be unfair. The trial court also found that the victim's prior statement did not relate to any of the material issues at trial but related to an incident that occurred while the victim was playing with another child.

## B. Analysis

On appeal, the Defendant does not challenge the trial court's decision to exclude extrinsic evidence that the victim lied about striking the Defendant's daughter with a basketball. Rather, the Defendant limits his challenge to the trial court's exclusion of extrinsic evidence that the victim previously had stated that she liked to lie to get others into trouble. The Defendant does not contend that such evidence was admissible pursuant to Tennessee Rule of Evidence 608 but maintains that the evidence is admissible for purposes of impeachment as a prior inconsistent statement under Rule 613.

Appellate courts, generally, review a trial court's decision regarding the admissibility of evidence for an abuse of discretion. *See State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010); *see also State v. Roderick Quatel Bates*, No. E2014-01741-CCA-R3-CD, 2015 WL 9019818, at *6 (Tenn. Crim. App. Dec. 15, 2015) ("We review the trial court's decision to admit extrinsic evidence of a prior inconsistent statement pursuant to Rule 613(b) for an abuse of discretion."). "A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *State v. Davis*, 466 S.W.3d 49, 61 (Tenn. 2015) (citing *State v. Clark*, 452 S.W.3d 268, 287 (Tenn. 2014); *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008)).

Tennessee Rule of Evidence 613(b) provides in pertinent part that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Our supreme court has held that "extrinsic evidence remains inadmissible until the witness either denies or equivocates as to having made the prior inconsistent statement." *State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998) (citations omitted).

- 17 -

Our supreme court recognized that Rule 613(b) "substantially maintains former Tennessee procedure." *Id.* at 568; *see* Tenn. R. Evid. 613, Advisory Comm'n Comments (noting that the implementation of Rule 613 "will not change drastically [former] Tennessee procedure"). This procedure "required that a witness' attention be drawn to the place, persons present, time of the statement, and to the substance of the statement before extrinsic evidence of the prior inconsistent statement could be used to impeach the witness' credibility." *Martin*, 964 S.W.2d at 567 (citing *Middle Tenn. R.R. Co. v. McMillan*, 134 Tenn. 490, 515-16, 184 S.W. 20 (1916)). The purposes of these foundational requirements were to "(1) provide the witness an opportunity to admit, deny, or explain the prior inconsistent statement; (2) refresh with witness' memory; and (3) allow the witness to respond intelligently to the impeachment attempt." *Id.* (citing *Middle Tenn. R.R. Co.*, 134 Tenn. at 515-16; *Moore v. Bettis*, 30 Tenn. 67, 69 (1850)). However, pursuant to Rule 613(b), the trial court may depart from the foundational requirements when "'the interests of justice otherwise require.'" *Id.* at 568 (quoting Tenn. R. Evid. 613(b)). "This clause provides flexibility to deal with the extraordinary case in which the strict application of the [foundational requirements] would lead to injustice." *Id.* (citation omitted).

In the present case, the trial court found that the Defendant did not meet the foundational requirements for admission of extrinsic evidence of the victim's prior statement by failing to provide the victim with an opportunity to explain or deny the statement. When questioning the victim about the statement on cross-examination, defense counsel did not draw the victim's attention to when and where she made the statement, who was present, or the circumstances under which the statement was made. Rather, defense counsel simply asked the then-twelve-year-old victim whether she had ever stated that she liked to lie to get others into trouble. "It is not enough to ask a witness a general question, whether he has ever said 'so and so,' or whether he has always told the same story." *State v. Neil Vader*, No. M2011-02394-CCA-R3-CD, 2013 WL 1279196, at *4 (Tenn. Crim. App. Mar. 28, 2013) (citations omitted). By failing to provide any details regarding the statement, defense counsel did not afford the victim an effective opportunity to admit, deny, or explain the statement, did not attempt to refresh the victim's memory, and did not grant the victim the opportunity to respond intelligently to the impeachment attempt. The trial court properly found that the Defendant failed to meet the foundational requirements for admission of extrinsic evidence of a prior inconsistent statement pursuant to Rule 613(b). *See id.* (holding that defense counsel failed to meet the foundational requirements for the admission of extrinsic evidence of a prior inconsistent statement pursuant to Rule 613(b) when defense counsel only asked the witness on cross-examination whether he had made the statement to "anybody else").

The circumstances of this case also did not present an extraordinary case in which strict application of the foundational requirements would lead to injustice. *See Martin*,

964 S.W.2d at 568. The trial court found that when questioning the victim on cross-examination, defense counsel was aware of the victim's statement, when and where it was made, who was present, and the circumstances under which she made the statement. Defense counsel simply chose not to reveal those details to the victim. Therefore, we conclude that the trial court properly exercised its discretion in excluding the extrinsic evidence.

Although the Defendant contends on appeal that the exclusion of the evidence violated his constitutional rights to present a defense and confront witnesses, the Defendant did not raise these issues in the trial court. Accordingly, these issues are waived. *See* Tenn. R. App. P. 36(a); *State v. Rodney Darnell Robinson*, No. M2019-00303-CCA-R3-CD, 2020 WL 1923152, at *45 (Tenn. Crim. App. Apr. 2, 2020), *perm. app. denied* (Tenn. Aug. 7, 2020).

## CONCLUSION

Upon reviewing the record, the parties' briefs and arguments, and the applicable law, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE